**E-FILED**
Thursday, 28 May, 2009  02:30:13 PM
Clerk, U.S. District Court, ILCD

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | |
|---|---|---|
| PDC LABORATORIES, INC., an Illinois corporation, | ) ) ) | Case No. 1:09-cv-01110-MMM-BGC |
| Plaintiff, | ) ) | |
| v. | ) ) | Judge: Michael M. Mihm<br>Magistrate Judge: Byron G. Cudmore |
| HACH COMPANY, a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

**PDC LABORATORIES, INC.'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT SEEKING TO
LIMIT PLAINTIFF'S CLAIMS FOR CONSEQUENTIAL DAMAGES AND
OTHER DAMAGES BEYOND THE AMOUNTS PAID FOR THE GOODS**

NOW COMES Plaintiff PDC LABORATORIES, INC. ("PDC"), by and through its undersigned attorneys, and as and for its Response in Opposition to the Motion for Partial Summary Judgment Seeking to Limit Plaintiff's Claims for Consequential Damages and Other Damages Beyond the Amounts Paid for the Goods filed by Defendant HACH COMPANY ("Hach"), states as follows:

**A.      INTRODUCTION**

In the Motion for Partial Summary Judgment, Hach claims that certain Terms & Conditions available on its website constitute part of PDC's contract to purchase agar plates from Hach, and that such Terms & Conditions bar PDC's claims for damages beyond the amounts PDC paid for the agar plates.  This conclusion is incorrect.  First, the Hach Terms & Conditions are not part of PDC's contract for purchase of the agar plates, as they were not sufficiently conspicuous to form part of such contract and the inclusion of same in such contract would be

procedurally unconscionable.   Second, even if the Terms & Conditions were part of PDC's contract for purchase of the Plates, the limitation of consequential damages contained therein would be void pursuant to Colorado law, because such limitation fails of its essential purpose and deprives PDC of the benefit of its bargain.   For these reasons, PDC submits that the Motion for Partial Summary Judgment should be denied.

**B.     RESPONSE TO "UNDISPUTED MATERIAL FACTS"**

    **1.     Undisputed Material Facts**

Nos. 1-2, 4 (though not the footnote appended thereto, which is addressed in Section B(2), below), and 5-10.

    **2.     Disputed Material Facts**

No. 3:  PDC further objects to Fact No. 3, on the ground that it is a legal conclusion, not a fact.  Stating further, PDC disputes that it agreed to the Terms and Conditions of Sale found on Hach's website, as is discussed below.

Footnote to No. 4:  PDC objects to the content of the footnote appended to Fact No. 4, on the ground that such content consists of legal conclusions, rather than facts.  Stating further, PDC disputes that Colorado law is controlling in this case, as is discussed below.

    **3.     Immaterial Facts**

None.

    **4.     Additional Material Facts**

1.     All the Plates were warranted to be useable for one year after their manufacture. (Affidavit of Keith A. Earhart, attached hereto as Exhibit A, ¶9).

2.     All of the failed Plates have the same "lot" designation.  (Ex. A, ¶10).

3.      PDC is a subcontractor to MEC Water Resources, Inc. ("MEC"), an environmental contractor.  (Ex. A, ¶11).

4.      MEC contracted with the Metropolitan St. Louis Sewer District (the "District") to perform certain services for the District, involving sampling of water from the Mississippi River and its tributaries during storm events to monitor sewer overflow into the river (the "Project").  (Ex. A, ¶12).

5.      PDC's part of the Project is to analyze samples of river water sent to PDC by MEC.  (Ex. A, ¶13).

6.      PDC began using the Plates for its work on the Project in November or December, 2007.  The Plates used during this time period did not appear to be defective.  (Ex. A, ¶14).

7.      PDC used approximately 148 of the Plates to analyze samples of river water sent to PDC by MEC, collected from four days of sampling in two storm events in May, 2008, for *E. coli* bacteria.  (Ex. A, ¶15).

8.      The Plates utilized in testing of the May, 2008 samples showed no growth of *E. coli* bacteria whatsoever.  (Ex. A, ¶16).

9.      PDC tested additional Plates and discovered that even when same were exposed to waste water known to contain *E. coli* bacteria, no growth was observed.  (Ex. A, ¶17).

10.     PDC, after conducting an investigation, concluded that the remaining Plates were defective, and notified Hach of same.  (Ex. A, ¶18).

11.     Hach performed some investigation into the defects in the Plates.  (Ex. A, ¶19).

12.     PDC was advised by the Hach personnel analyzing the Plates that they had concluded that the Plates were not defective at the time of their manufacture.  (Ex. A, ¶20).

13.    PDC was advised by the Hach personnel analyzing the Plates that they had concluded that the Plates were exposed to excessive heat during shipping of same to PDC, which shortened the Plates' useful lives to less than one year.  (Ex. A, ¶21).

14.    Hach did not ship the Plates in a refrigerated compartment, and made no attempt to keep the Plates cool in transport.  (Ex. A, ¶22).

15.    It is PDC's practice to immediately put all plates of this type into a refrigerator upon receipt of same.  (Ex. A, ¶23).

16.    PDC had no idea at the time it received the Plates that they were defective (or had been overheated).  (Ex. A, ¶24).

17.    In fact, there was no way for PDC to tell that the Plates were defective (or had been overheated) at the time of receipt of same.  (Ex. A, ¶25).

18.    Only when the Plates were used in May, 2008 did PDC discover that the Plates were defective (or had been overheated).  (Ex. A, ¶26).

19.    Pursuant to its contractual relationship with MEC, PDC was to receive $16,027.00 from MEC relating to the May, 2008 storm events.  (Ex. A, ¶27).

20.    After the failure of the Plates, there was no way to retest the effects of the May, 2008 storm events on the river.  (Ex. A, ¶28).

21.    The failure of the Plates delayed the Project.  (Ex. A, ¶29).

22.    MEC did not pay PDC any amounts relating to the May, 2008 storm events.  (Ex. A, ¶30).

23.    MEC demanded that PDC pay MEC $54,592.10 in damages.  (Ex. A, ¶31).

24.    MEC has offset amounts due to PDC for work performed on the Project subsequent to the May, 2008 storm events against the $54,592.10 MEC demanded from PDC. (Ex. A, ¶32).

25.    MEC has withheld payments to PDC in the amount of $54,592.10 for work performed on the Project subsequent to the May, 2008 storm events, thereby satisfying its demand. (Ex. A, ¶33).

26.    Because of the defective Plates, the District and MEC threatened to fire PDC from the Project if PDC could not demonstrate that it would not generate any additional incorrect data, and considered discarding all data produced by PDC in connection with the Project. (Ex. A, ¶34).

27.    In response to these considerations, PDC undertook an extensive and costly investigation pertaining to the Plates, and created new operational strictures to guard against further defective testing supplies. (Ex. A, ¶35).

28.    PDC presently estimates the cost of its investigation and analysis to be $19,915.00. (Ex. A, ¶36).

## C.    ARGUMENT

### 1.    Hach's Terms & Conditions are not part of PDC's contract for purchase of the Plates because such Terms & Conditions are procedurally unconscionable.

#### a.    The Terms & Conditions, in their entirety, are procedurally unconscionable under Illinois and Colorado law.

Hach's Terms & Conditions, in their entirety, should not be considered to be part of PDC's contract for purchase of the Plates because the Terms & Conditions are procedurally unconscionable.  Insofar as the entirety of the Terms & Conditions is void, Illinois law should

control this analysis.  However, because is no significant conflict between Illinois and Colorado law on this point, the Court need not perform a conflict of laws analysis.

The Colorado Uniform Commercial Code's general unconscionability provision provides as follows:

> (1) If the court, as a matter of law, finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.
>
> (2) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect, to aid the court in making the determination.

Colo. Rev. Stat. §4-2-302 (West 2009).  The Illinois Uniform Commercial Code's general unconscionability provision is identical, with the exception of the removal of a few commas. 810 ILCS §5/2-302 (West 2009).

In the case of <u>Frank's Maintenance & Engineering, Inc. v. C. A. Roberts Co.</u>, one Illinois Appellate Court described and discussed procedural unconscionability as follows:

> Unconscionability can be either procedural or substantive or a combination of both. (*Schroeder v. Fageol Motors, Inc.* (1975), 86 Wash.2d 256, 544 P.2d 20; *Johnson v. Mobil Oil Corp.* (E.D.Mich.1976), 415 F.Supp. 264.) Procedural unconscionability consists of some impropriety during the process of forming the contract depriving a party of a meaningful choice. (*Schroeder v. Fageol Motors, Inc.* (1975), 86 Wash.2d 256, 544 P.2d 20; *Williams v. Walker-Thomas Furniture Co.* (1965), 121 U.S.App.D.C. 315, 350 F.2d 445.) Factors to be considered are all the circumstances surrounding the transaction including the manner in which the contract was entered into, whether each party had a reasonable opportunity to understand the terms of the contract, and whether important terms were hidden in a maze of fine print; both the <u>conspicuousness</u> of the clause and the negotiations relating to it are important, albeit not conclusive

> factors in determining the issue of unconscionability. (*Schroeder v.*
> *Fageol Motors, Inc.* (1975), 86 Wash.2d 256, 544 P.2d 20.)

86 Ill.App.3d 980, 989-90, 408 N.E.2d 403, 409-10, 42 Ill.Dec. 25, 31-32 (1 Dist. 1980) (emphasis added) (cited extensively with approval in <u>Kinkel v. Cingular Wireless LLC</u>, 223 Ill.2d 1, 857 N.E.2d 250, 306 Ill.Dec. 157 (2006), and <u>Razor v. Hyundai Motor America</u>, 222 Ill.2d 75, 854 N.E.2d 607, 305 Ill.Dec. 15 (2006), *cert. denied*, 549 U.S. 1181, 127 S.Ct. 1156, 166 L.Ed.2d 996 (2007).

The Colorado Uniform Commercial Code provides the following definition of "conspicuous":

> "Conspicuous", with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:
>
> (A) A heading in capital letters equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and
>
> (B) Language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

Colo. Rev. Stat. §4-1-201(b)(10) (West 2009); *see also* 810 ILCS §5/1-201(b)(10) (West 2009) (essentially the same).

The Terms & Conditions themselves never appeared on the screen in the ordinary course of placing an order on Hach's website.  (*See* Ex. A to Hach's Motion).  In order to access the Terms & Conditions, it appears that the customer was required to click on a blue hyperlink stating "Standard Terms and Conditions" or "Standard Terms and Conditions of Sale."  (<u>Id.</u>) These hyperlinks apparently appear on three pages during Hach's online order procedure.  (<u>Id.</u>)

At no point in Hach's online order procedure did Hach state that all sales are subject to the Terms & Conditions. (*See* Ex. A to Hach's Motion). This varies dramatically from the cases cited by Hach in its Motion for Partial Summary Judgment. In Hubbert v. Dell Corp., Dell's online order forms recited on three separate pages that "[a]ll sales are subject to Dell's Term[s] and Conditions of Sale." 359 Ill.App.3d 976, 984, 835 N.E.2d 113, 121-22, 296 Ill.Dec. 258, 266-67 (5th Dist. 2005), *appeal denied*, 217 Ill.2d 601, 844 N.E.2d 965, 300 Ill.Dec. 522 (2006). Similarly, in Druyan v. Jagger, the other case cited by Hach on this point, the Court noted that "[t]o purchase her tickets from Ticketmaster, the plaintiff was required to click on a 'Look for Tickets' button, immediately above which appears the statement 'By clicking on the 'Look for Tickets' button or otherwise using this web site, you agree to the Terms of Use.'" 508 F.Supp.2d 228, 237 (S.D.N.Y. 2007). On this basis alone it should be clear that the Terms & Conditions are procedurally unconscionable in this circumstance. (Notably, in Hubbert, the clause at issue provided for arbitration of disputes, and as such the Court's ruling enforcing the clause was based substantially on the fact that "Federal and State law strongly favors arbitration, and a presumption exists in favor of arbitration agreements." 359 Ill.App.3d at 983, 835 N.E.2d at 121, 296 Ill.Dec. at 266. Also, the conclusions in Hubbert were called into question in Wigginton v. Dell, Inc., 382 Ill.App.3d 1189, 890 N.E.2d 541, 321 Ill.Dec. 819 (5th Dist. 2008).)

The "Standard Terms and Conditions" hyperlink in this case apparently appeared on only three pages rather than five, as in Hubbert. (*See* Ex. A to Hach's Motion). Of those three pages, on only one does the hyperlink appear in a narrative context:

> Prices are in U.S. currency and are FOB USA Factory. Shipping and related transportation fees are for the account of the purchaser. Prices shown on this site are for orders and products to be used in the 50 United States. Hach maintains a network of international distributors offering sales and support services. Distributor pricing will vary due to shipping, duties, and other import costs. See **Standard Terms and Conditions of Sale** for complete information.

(Ex. 1 to Ex. A to Hach's Motion).  From reading this, it would reasonably appear that the linked materials related only to pricing and shipping costs.  At no point in the ordering process is it disclosed that the Terms & Conditions are not, in fact, "standard," and that they actually cause the forfeiture of substantive procedural rights and causes of action by Hach's customer.  (*See* Ex. A to Hach's Motion).

Moreover, in most reported "clickwrap" cases, the customer was required to click a button prior to completing its order expressly accepting the terms and conditions proposed by the vendor.  *See*, *e.g.*, Adsit Co., Inc. v. Gustin, 874 N.E.2d 1018, 1023 (Ind.App. 2007) ("The user is required to take affirmative action by clicking on the "I Accept" button; if the user refuses to agree to the terms, she cannot engage in the transaction") (collecting cases); Davis v. Dell, Inc., 2007 WL 4623030, *4 (D.N.J. Dec 28, 2007), *affirmed*, 2008 WL 3843837 (D.N.J. Aug 15, 2008) (collecting cases).  In contrast, in this case, PDC was able to purchase the Plates without ever being shown the text of the Terms & Conditions.  (*See* Ex. A to Hach's Motion).

Finally, it does not appear that the Terms & Conditions were *ever* tendered to PDC in hard copy, either at the time of the sale of or delivery of the Plates.  (*See* Ex. A to Hach's Motion).

In any case, this issue presents a mixed question of fact and law, which should be dealt with only after an evidentiary hearing.  As above, under both Colorado and Illinois law, while the ultimate determination on unconscionability is a question of law, "the parties shall be afforded a reasonable opportunity to present evidence as to [the provisions'] commercial setting, purpose, and effect...."  Colo. Rev. Stat. §4-2-302(2); *see also* 810 ILCS §5/2-302(2).  *See* Mullan v. Quickie Aircraft Corp., 797 F.2d 845, 850 (10th Cir.1986) ("when a finding on a

question of law is made by the district court upon the presentation of evidence, the finding becomes properly a mixed question of law and fact.").

Therefore, Hach's Motion for Partial Summary Judgment should be denied, as there are questions of fact and law in dispute.

> **2.    Even if the Terms & Conditions were part of PDC's contract for purchase of the Plates, the limitation of damages clause contained therein would be void pursuant to Colorado law.**

If the Terms & Conditions were part of PDC's contract for purchase of the Plates (which they were not), Colorado law would apply to the Court's analysis of the limitation of damages provision in the Terms & Conditions. The Colorado Uniform Commercial Code provides that "[r]emedies for breach of warranty can be limited in accordance with the provisions of this article on liquidation or limitation of damages and on contractual modification of remedy (sections 4-2-718 and 4-2-719)." Colo. Rev. Stat. §4-2-316(4) (West 2009). The Code provides, in pertinent part, as follows regarding limitation of damages for breach of warranties:

> (2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
>
> (3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. * * *.

Colo. Rev. Stat. §4-2-719(2) & (3) (West 2009). In this case, the limited remedy of return of the cost of the Plates fails of its essential purpose, and the waiver of consequential damages in the Terms & Conditions is unconscionable.

Attached hereto as Exhibit A is the Affidavit of Keith Earhart, the Laboratory Supervisor of the Florissant, Missouri office of PDC. Mr. Earhart's Affidavit establishes that the limitation of damages clause failed of its essential purpose and is unconscionable. Assuming that Hach disputes these conclusions and the facts set forth in Mr. Earhart's Affidavit, Hach will

presumably file counter-affidavits with its Reply in support of its Motion for Partial Summary

Judgment.  If the Court finds that there are disputed factual issues, it must deny Hach's Motion

for Partial Summary Judgment at this time.  Fed.R.Civ.P. 56(c).  As one Colorado Appellate

Court stated in Wenner Petroleum Corp. v. Mitsui & Co. (U.S.A.), Inc. on this point:

> Here, the record reveals that this question of failure of essential
> purpose, as well as the issue of the unconscionability of the
> limitation, could not properly be disposed of by summary
> judgment. An affidavit was filed by Wenner in which one of its
> corporate officers raised factual issues relevant both to the
> contentions of failure of essential purpose and unconscionability.
>
> Summary judgment is a drastic remedy. The movant must make a
> convincing showing that genuine issues of fact are not present. See
> *Ginter v. Palmer & Co.*, 196 Colo. 203, 585 P.2d 583 (1978). No
> such showing was made here. Indeed, as stated in *Milgard
> Tempering, Inc. v. Selas Corp.*, 761 F.2d 553 (9th Cir.1985), when
> dealing with the issues of an allegation of grossly unequal
> bargaining power, summary judgment is inappropriate. "Only after
> all of the circumstances surrounding the negotiation and
> performance of the contract have been determined at trial can the
> enforceability of the consequential damages limitation be
> determined...."

748 P.2d 356, 357-58 (Colo.App. 1987).

### a.    The limitation of damages clause fails of its essential purpose.

In the case of Cooley v. Big Horn Harvestore Systems, Inc., 813 P.2d 736 (Colo. 1991),

the Colorado Supreme Court analyzed the claim of the plaintiff dairy farmers that the limitation

of remedies clause in their purchase contract for an automated grain storage and distribution

system for use in their dairy operation failed of its essential purpose.  Over two years, the grain

system not only failed "to improve the efficiency and productivity of the dairy," but actually

caused the illness and death of many of the plaintiffs' cows and perpetuated the closure of the

dairy.  Id. at 738-39.  The plaintiffs sought consequential damages, arguing that while their

purchase agreement "contained an express warranty of repair or replacement and a disclaimer

clause limiting their remedy to a suit for breach of that warranty," the limitation failed of its essential purpose. Id. at 743.

The Court considered the purpose and application of Colo. Rev. Stat. §4-2-719(2), stating in pertinent part as follows:

> The policy behind the statutory provision establishing the failure of essential purpose doctrine is discussed in the official comments to the Code, as follows:
>
>> [I]t is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obligations or duties outlined in the contract.... [U]nder subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.
>
> § 4-2-719, 2 C.R.S. comment 1 (1973). The comment makes clear that determination of the applicability of the failure of essential purpose doctrine requires a two-tiered evaluation: first, identification of the essential purpose of the limited remedy, and second, whether the remedy in fact failed to accomplish such purpose. *Milgard Tempering, Inc. v. Selas Corp.*, 902 F.2d 703 (9th Cir.1990); *Chatlos Systems, Inc. v. National Cash Register Corp.*, 635 F.2d 1081 (3d Cir.1980).

Id. at 743. The Court further noted that "[f]rom a buyer's standpoint, a promise to repair or replace defective parts supplies assurance that within a reasonable period of time defective goods will be put into the condition they were warranted to be in at the time they were purchased. [Footnote omitted.] *Milgard; Chatlos*; *Clark v. International Harvester Co.*, 99 Idaho 326, 581 P.2d 784 (1978); *Beal v. General Motors Corp.*, 354 F.Supp. 423 (D.Del.1973). See C. Smith & B. Clark, The Law of Product Warranties, 8.04[2] at 8-52 (1984)." Id. The Court concluded that "[t]he plaintiffs introduced sufficient evidence to establish that the Harvestore system was never

functional, thus permitting the jury to conclude that the limited remedy of a suit for breach of the warranty to repair or replace failed of its essential purpose." Id.

In the case of Leprino v. Intermountain Brick Co., 759 P.2d 835 (Colo.App. 1988), a Colorado District Court considered the claim of buyers of white bricks that a limitation of consequential damages failed of its essential purpose, where latent defects in the bricks caused staining of same, necessitating removal and replacement of the bricks after installation at far greater cost than that of the bricks initially. The Court stated as follows regarding the limitation of consequential damages:

> Failure of the essential purpose of a remedy is measured by whether the buyer is deprived of the substantial value of his bargain. *Wenner Petroleum Corp. v. Mitsui & Co.* 748 P.2d 356 (Colo.App.1987). One situation in which a limitation of remedy to return of the purchase price has been held to fail of its essential purpose is when goods have latent defects which are not discoverable upon receipt and reasonable inspection. See *Earl M. Jorgensen Co. v. Mark Construction, Inc.*, 56 Hawaii 466, 540 P.2d 978 (1975); *Neville Chemical Co. v. Union Carbide Corp.*, 294 F.Supp. 649 (W.D.Pa.1968), vacated on other grounds, 422 F.2d 1205 (3d Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

Id. at 837. The Court concluded that the limitation failed of its essential purpose as to the latent defects in the bricks because "[w]hen the parties agreed to limit the buyers' remedy to refund of the purchase price, they contemplated a situation in which the defective bricks would be returned to Intermountain prior to installation and the purchase price would be returned to the plaintiffs. In other words, the contract would be rescinded." Id.

The Leprino Court also considered another situation in which a limited remedy fails of its essential purpose: "The other situation is when the action or inaction of the seller causes the limited remedy to fail of its essential purpose. See *Jones & McKnight Corp. v. Birdsboro Corp.*,

320 F.Supp. 39 (N.D.Ill.1970); *Adams v. J.I. Case Co.*, 125 Ill.App.2d 388, 261 N.E.2d 1

(1970)." Id. On this theory, the Court concluded as follows:

> Here, the trial court also found that Intermountain had abandoned
> the plaintiffs after the brick cleaning solvent failed to rectify the
> discoloration and that the plaintiffs acted reasonably in their efforts
> to mitigate the damages and in continuing to construct the house
> with the bricks. Thus, Intermountain had made the limited remedy
> ineffective because an entire shipment of worthless bricks was
> installed as a direct consequence of its inaction. We will not permit
> Intermountain to cause the limited remedy to fail of its essential
> purpose with the buyers suffering substantial consequential
> damages and then shield itself from liability for these damages
> because of the limitation on remedy.

Id. *See also* Lutz Farms v. Asgrow Seed Co., 948 F.2d 638, 646 (10th Cir. (Colo.) 1991)

(gathering cases).

In Fiberglass Component Production, Inc. v. Reichhold Chemicals, Inc., 983 F.Supp. 948,

960 (D.Colo. 1997), a District Court in Colorado considered whether a limitation of damages

clause should be enforced where a defect in a resin sold to the plaintiff by the defendant for the

manufacture of fiberglass panels used in housings for air conditioning units required the recall

and refit of all air conditioning units using such panels.  The Court found that the limitation

failed of its essential purpose, stating, in part, as follows:

> Generally, the failure of essential purpose exception applies only to
> those situations in which the buyer is left without a remedy.
> *Wenner Petroleum Corp. v. Mitsui & Co.*, 748 P.2d 356, 357
> (Colo.App.1987). Failure of the essential purpose of a remedy is
> measured by whether the buyer is deprived of the substantial value
> of his bargain. *Id.* For example, when goods have latent defects
> which are not discoverable upon receipt and reasonable inspection,
> a limitation of remedy to return of the purchase price fails of its
> essential purpose. *Id.* (citations omitted).

Id.  Applying the facts to the law, the Court found that the defect in the resin was not subject to discovery upon reasonable inspection, and further found as follows regarding the cost of the resin versus the cost of the recall and refit:

> The cost of the RCI 6657 resin represents a minute fraction of the total cost of the recall and retrofit. *Id.* Under these circumstance[s], limiting FCP's damages to the cost of the RCI 6657 resin would deprive FCP of the benefits of its bargain. Thus, a jury could find that any damages limitation fails of its essential purpose.

Id.

The failure of the essential purpose of a limited remedy is a question of fact.  *See*, *e.g.*, Curragh Queensland Min. Ltd. v. Dresser Industries, Inc., 55 P.3d 235 (Colo.App. 2002), *as modified on denial of rehearing* (2002), *certiorari dismissed* (2002), *rehearing denied* (2002) (after repeated failed attempts to repair a "Planetary Swing Drive Dragline" (used in coal reclamation), followed by abandonment of such repairs, limitation of damages to repair or replacement failed of its essential purpose); Rose v. Colorado Factory Homes, 10 P.3d 680, 684 (Colo.App. 2000), *cert. denied* (2000) ("as the record indicates, and the jury apparently determined, seller's repair remedy had proven unsuccessful and had failed to achieve its essential purpose-the value of the home remained substantially impaired."); *see also*, *e.g.*, Fiberglass Component Production, 983 F.Supp. at 960.

The defect at issue in this case is clearly "latent."  All the Plates bore the following legend on their packaging:

## CERTIFICATE OF ANALYSIS

> Hach Company certifies that the modified m-TEC Agar is ready to use and manufactured for the analysis of *E. coli* in recreational water using standard membrane filtration procedures in the references listed below.  Representative samples meet the following specifications

* * *

Shelf Life at 2 – 8°C          1 year

* * *

(Complaint, ¶17 (Exhibit B); Answer, ¶17).  Furthermore, each Plate bore an expiration date.
(*See*, *e.g.*, Exhibit B to Complaint, lower right corner of label, "Exp. May02 – 09").   PDC had
no idea at the time it received the Plates that they were defective (or were exposed to excessive
heat during shipping, as was claimed by Hach's personnel).  (Ex. A, ¶¶24-26, 19-21).  The first
of the Plates used functioned properly.  (Ex. A, ¶14).  Only when the Plates were used in May,
2008, did PDC discover that the Plates were defective.  (Ex. A, ¶¶16-18, 26).  PDC could not
determine at the time it received the Plates that some or all of the Plates were not "ready to use
and manufactured for the analysis of *E. coli* in recreational water using standard membrane
filtration procedures" as warranted by Hach.  (Ex. A, ¶24-26).  *See* Leprino, 759 P.2d at 837;
Fiberglass Component Production, 983 F.Supp. at 960.

Moreover, the cost of the Plates was less than $6,000, while PDC's damages from the
failure of the Plates are (thus far) more than $90,000.  (Ex. A, ¶¶27-36).  *See* Fiberglass
Component Production, 983 F.Supp. at 960.  The cost of the Plates is negligible compared to the
damages from failure of the Plates.  After the failure of the Plates, there was no way to retest the
effects of the May, 2008 storm events on the river, causing a delay of the Project.  (Ex. A, ¶¶28-
29).  The public health and safety repercussions from failure of the Plates should also be
considered by the Court.

Under these circumstances, limiting PDC's damages to the cost of the Plates would
deprive PDC of the benefits of its bargain.  Therefore, the limitation of damages clause in the
Terms & Conditions fails of its essential purpose and is void pursuant to Colo. Rev. Stat. §4-2-
719(2).

### b.      The limitation of damages clause is substantively unconscionable.

In addition to failing of its essential purpose, the limitation of damages clause in Hach's Terms & Conditions may be substantively unconscionable. Colo. Rev. Stat. §4-2-719(3). While the Colorado Uniform Commercial Code does not define "unconscionability," it does provide that "[u]nless displaced by the particular provisions of this title, the principles of law and equity, ... shall supplement its provisions." Colo. Rev. Stat. §4-1-103(b) (West 2009). Therefore, Colorado common law applies to the analysis of unconscionability under the Colorado Uniform Commercial Code. *See* Mullan, 797 F.2d at 850.

As above, the issue of unconscionability presents a mixed question of fact and law. Colo. Rev. Stat. §4-2-302(2); Mullan, 797 F.2d at 850. In Mullan, the Tenth Circuit Court of Appeals considered the general unconscionability provision under the Colorado Uniform Commercial Code, setting forth the Colorado law on unconscionability as follows:

> In *Davis v. M.L.G. Corp.*, 712 P.2d 985, 991 (Colo.1986) (citation omitted), the Colorado Supreme Court summarized the standard for finding common law unconscionability:
>
>> In order to support a finding of unconscionability, there must be evidence of some overreaching on the part of one of the parties such as that which results from inequality of bargaining power or under other circumstances in which there is an absence of meaningful choice on the part of one of the parties, together with contract terms which are unreasonably favorable to that party.
>
> In *Davis*, the Colorado Supreme Court enumerated the factors which it found relevant to a finding of unconscionability: (1) a standardized agreement executed by parties of unequal bargaining strength; (2) a lack of opportunity to read or become familiar with the document before signing it; (3) use of fine print in the portion of the contract containing the provision; (4) absence of evidence that the provision was commercially reasonable or should have been reasonably anticipated; (5) the terms of the contract, including substantive unfairness; (6) the relationship of the parties, including factors of assent, unfair surprise and notice; and (7) all

the circumstances surrounding the formation of the contract, including its commercial setting, purpose and effect.

Mullan, 797 F.2d at 850; *see also* Bonanno v. The Quizno's Franchise Co. LLC, 2008 WL 638367, *9 (D.Colo. Mar 05, 2008).

In Lutz Farms, 948 F.2d at 640, the Tenth Circuit Court of Appeals upheld the District Court of Colorado's finding that a limitation of damages clause was unconscionable, where the defendant's Brown Beauty onion seed was defective causing an "excessive number of double and misshapen onions in the 1984 crop" and "making it necessary to destroy much of the crop and to sell the remainder of the crop at drastically reduced prices." *See* id. at 646.

In this case, there is clearly a standardized agreement purportedly "executed" by parties of unequal bargaining strength. PDC lacked an opportunity to read or become familiar with the Terms & Conditions before (allegedly) accepting same for the reasons set forth in Section C(1), above. While the Terms & Conditions were not in "fine print," they were hidden from view, again as set forth in Section C(1), above. As is discussed in Section C(2)(a), above, the damages from the failure of the Plates substantially exceed the cost of the Plates. Based on these factors, there is clearly a mixed question of fact and law at issue here precluding summary judgment. In any case, pursuant to Colo. Rev. Stat. §4-2-302(b), PDC should be "afforded a reasonable opportunity to present evidence as to [the limitation of damages provision's] commercial setting, purpose, and effect...."

## D.    CONCLUSION

For all the foregoing reasons, PDC submits that Hach's Motion for Partial Summary Judgment must be denied.

WHEREFORE, PDC respectfully requests that this honorable Court deny the Motion for Partial Summary Judgment Seeking to Limit Plaintiff's Claims for Consequential Damages and

Other Damages Beyond the Amounts Paid for the Goods filed by Hach, and award PDC such

other and further relief as is deemed appropriate under the circumstances.

Respectfully submitted,

PDC LABORATORIES, INC.,
Plaintiff

By: ___/s/ Janaki Nair_____
        One of its attorneys

Brian J. Meginnes, Esq.
Janaki Nair, Esq.
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
Telephone:  (309) 637-6000
Facsimile:  (309) 637-8514

909-0496

**CERTIFICATE OF COMPLIANCE PURSUANT TO**
**<u>CENTRAL DISTRICT OF ILLINOIS LOCAL RULE 7.1</u>**


Pursuant to Local Rule 7.1(D) of the Rules of the United States District Court, Central District of Illinois, the undersigned hereby certifies that an analysis of Sections C and D of the foregoing Response using the document information program of Microsoft Word yields the following results:

| | |
|---|---|
| Words: | 4,356 |
| Characters: | 27,005 (with spaces) |

The Response is therefore in compliance with the volume type limitation of Local Rule 7.1(D).


Date: May 28, 2009

       /s/ Janaki Nair

Janaki Nair, Esq.
*Attorney for Plaintiff*
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
Telephone:  (309) 637-6000
Facsimile:  (309) 637-8514

## **PROOF OF SERVICE**

I hereby certify that on May 28, 2009, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Gregory A Cerulo
gcerulo@qjhpc.com, Pmonroe@qjhpc.com

I also hereby certify that on n/a, 2009, I served a copy of the foregoing document on the following at the respective business addresses below by deposit in the U. S. Mail, postage prepaid, at Peoria, Illinois:

None.

_____/s/ Janaki Nair_____
Janaki Nair, Esq.
*Attorney for Plaintiff*
Elias, Meginnes, Riffle & Seghetti, P.C.
416 Main Street, Suite 1400
Peoria, IL 61602
Telephone:  (309) 637-6000
Facsimile:  (309) 637-8514